## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

ACE AMERICAN INS. CO., et al.,
      Plaintiffs,

     v.

KEYSTONE CONSTRUCTION &
MAINTENANCE SERVICES, INC., et al.,
      Defendants.

No. 3:11cv1136 (SRU)

## RULING ON MOTIONS TO DISMISS

This case arises from the February 7, 2010 natural gas explosion at Kleen Energy

Systems' ("Kleen") power plant in Middletown, Connecticut ("Kleen Plant"). The complaint

was filed on July 19, 2011. Over the next several months, motions to dismiss were filed by the

following defendants: Bluewater Energy Solutions, Inc. ("Bluewater"); Keystone Construction

and Maintenance Services, Inc. ("Keystone"); Sprague Energy Corp. ("Sprague");

WorleyParsons Group, Inc. ("WorleyParsons"); Siemens Energy, Inc. ("Siemens"); Algonquin

Gas Transmission LLC ("Algonquin"); and Spectra Energy, Inc. ("Spectra"). Sprague also filed

a motion to strike the answer to the third-party complaint. On February 17, 2012, I heard oral

arguments on the motions to dismiss. At the conclusion of that hearing, I took the motions to

dismiss under advisement.

For the reasons stated below, I grant the following motions: doc. 63 (Bluewater's motion

to dismiss), doc. 65 (Keystone's motion to dismiss), doc. 156 (Sprague's motion to dismiss), doc.

159 (WorleyParsons' motion to dismiss), doc. 162 (Siemens' motion to dismiss), and doc. 173

(Algonquin and Spectra's motion to dismiss). I deny doc. 137 (Sprague's motion to strike) and

doc. 188 (Sprague's motion to file a third-party complaint).

# I.    Background[1]

On February 7, 2010, there was a natural gas explosion at the Kleen Plant, resulting in deaths, injuries, and significant property damage. The explosion occurred during a gas blow. A "gas blow" is an operation during which natural gas is forced through piping at high pressure and velocity, in order to remove debris before the piping is used to deliver natural gas to gas turbines. During the gas blow, debris and natural gas are expelled through temporary gas piping into the atmosphere, where the gas is intended to disperse. Gas blows are inherently dangerous, because the accumulation of static electricity from the flow of gas, and expelled debris sparking against nearby objects, can cause the gas to self-ignite. Kleen was unaware of the highly dangerous nature of the gas blow process. Kleen was also unaware that the attendant hazards of a gas blow could not be eliminated.

On February 7, the temporary gas piping used to expel natural gas was not directed vertically up into the atmosphere. Instead, the temporary piping was almost horizontal, directing the expelled natural gas and debris into a confined area with numerous sources of ignition. Also in that confined area were workers, who were engaged in welding and other activities.

After the explosion, the Governor of Connecticut issued an executive order banning power plants from using natural gas in gas blows. Around that time, the National Fire Protection Association also instituted standards prohibiting the use of flammable gas to clean the interior of piping systems.

Prior to the explosion, Kleen had contracted with defendant O&G Industries, Inc. ("O&G") to design, construct, and deliver gas to the Kleen Plant. O&G subcontracted the work out to Keystone, Bluewater, WorleyParsons, and Siemens, among others.

---

[1] Unless otherwise noted, all background information is taken from the Third Amended Complaint.

Keystone was responsible for, among other things, engineering and designing the gas blow temporary piping, developing the safety procedures for the gas blow process, and implementing the gas blow process.

Bluewater was responsible for, among other things, the engineering and design of the temporary gas lines used for the gas blow process, the design and implementation of the gas blow process, and the design and implementation of gas blow safety procedures at the Kleen Plant.

WorleyParsons provided engineering services for the construction of the Kleen Plant, including the design of the main gas fuel supply line, end supply piping to the turbines, and implementation for gas piping.

The natural gas for the gas blows at the Kleen Plant was provided by Sprague. Sprague knew that the gas was to be used for a gas blow. Kleen did not alter the gas sold by Sprague in any way. Algonquin transported Sprague's natural gas to the Kleen Plant through its "Kleen Energy Lateral" and meter station. Algonquin knew that the gas was to be used for gas blows. Algonquin is Spectra's subsidiary.

Siemens required, in its "System Requirements," that the gas piping servicing its turbines be cleaned of all debris. In its system requirements, Siemens indicated that natural gas was typically used to clean gas piping. The plaintiffs are also suing Siemens AG, Siemens' parent company.

The plaintiffs in this case are Kleen's insurers, who paid approximately $200,000,000 to Kleen following the explosion. The insurance claims were for property damage and delays resulting from the explosion. The plaintiffs bring this lawsuit as subrogees of Kleen.

## II.    Standard of Review

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) is designed

"merely to assess the legal feasibility of a complaint, not to assay the weight of evidence which might be offered in support thereof." *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774, 779 (2d Cir. 1984) (quoting *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980)).

When deciding a motion to dismiss pursuant to Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true, draw all reasonable inferences in favor of the plaintiffs, and decide whether it is plausible that plaintiffs have a valid claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007); *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996).

Under *Twombly*, "[f]actual allegations must be enough to raise a right to relief above the speculative level," and assert a cause of action with enough heft to show entitlement to relief and "enough facts to state a claim to relief that is plausible on its face." 550 U.S. at 555, 570; *see also Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."). The plausibility standard set forth in *Twombly* and *Iqbal* obligates the plaintiffs to "provide the grounds of [their] entitlement to relief" through more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (quotation marks omitted). *Plausibility* at the pleading stage is nonetheless distinct from *probability*, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the claims] is improbable, and . . . recovery is very remote and unlikely." *Id*. at 556 (quotation marks omitted).

## III.    Discussion

There are three categories of claims covered by the motions to dismiss: (1) motions by the sellers of natural gas, (2) motions by the transporters of natural gas, and (3) motions by the subcontractors who designed the gas blow operation. Also pending are a motion to strike an

answer, and a motion to file a third-party complaint.

A. Sprague's Motion to Dismiss

Sprague, the seller of natural gas, has filed a motion to dismiss Count Seven of the Third Amended Complaint, which alleges that Sprague is liable under Conn. Gen. Stat. § 52-572m, Connecticut's product liability statute, and Count Eight of the Third Amended Complaint, which alleges that Sprague's conduct was reckless, wanton, and/or willful.

Under the Connecticut Product Liability Act, "[a] product seller may be subject to liability for harm caused to a claimant who proves by a fair preponderance of the evidence that the product was defective in that adequate warnings or instructions were not provided." Conn. Gen. Stat. § 52-572q(a). Sprague argues that Kleen's product liability claim must fail because, among other things, Sprague did not sell the natural gas that was used at the time of the Kleen Plant explosion.

Sprague acknowledges that Kleen bought natural gas from it on January 26, 2010, and that that gas was delivered on January 30, 2010 through the Algonquin/Spectra pipeline. Sprague claims, however, that Kleen did not use all of the natural gas delivered on January 30, and that Kleen had to sell back to Algonquin/Spectra any gas it had not used on January 30, so that it would begin February 2010 with a zero balance. Sprague also claims that it did not nominate, deliver, or sell natural gas to Kleen for the February 7, 2010, gas blow.

According to the plaintiffs, the natural gas used in the February 7, 2010 gas blow was not sold to Kleen by any gas supplier in advance of the gas blow. Instead, the plaintiffs say that Kleen took the gas it needed out of the Algonquin/Spectra line. The plaintiffs state that Kleen then, in late February, bought gas from Sprague to replace the gas it had used out of the Algonquin/Spectra line. Consequently, the plaintiffs argue, Kleen paid Sprague, not any other

supplier, for the gas used at the time of the explosion.

Under the plaintiffs' theory, then, Sprague is liable to Kleen for a failure to warn, even though, even under the plaintiffs' version of the facts, Sprague did not "sell" Kleen the gas used for the blow until late February. The plaintiffs argue that the liability arises because Sprague did know that the gas it sold Kleen in January would be used for the January 30 gas blow. Although the January 30 blow occurred without incident, the plaintiffs argue that Sprague had a continuing duty to warn of product defects even after the sale had been completed.

The plaintiffs are correct that sellers have a continuing duty to warn. *Densberger v. United Tech. Corp.*, 125 F. Supp. 2d 585 (D. Conn. 2000). Where the plaintiffs err is in treating the January and February gas sales as one continuous sale. In actuality, it is clear from even the plaintiffs' version of events that there were two separate sales. The plaintiffs acknowledged at oral argument that if any other company had provided the gas used in the February blow, that company would not be liable. That is because the gas was technically not "sold" until after the explosion occurred, and thus there can have been no duty to warn that arose prior to the explosion unless there was a continuing duty to warn. The plaintiffs also acknowledged that there is no case law that supports their argument that a continuing duty to warn can carry over to a subsequent sale. Sprague could not have warned Kleen that the February 7 gas should not be used for a gas blow, because the February 7 sale was not completed until <u>after</u> the explosion occurred. Therefore, Sprague's motion to dismiss the failure to warn claim is granted. Because Sprague is not liable for failure to warn, its failure to warn could not have risen to the level of wanton or reckless, and the motion to dismiss the recklessness claim is also granted.

B. <u>Sprague's Motion to Strike Answer to Third-Party Complaint</u>

Sprague has filed a third-party complaint against Kleen for contractual indemnification

and breach of contract (for failure to indemnify).  Sprague has now moved to strike certain answers and affirmative defenses to that third-party complaint.

Pursuant to Federal Rule of Civil Procedure 12(f), a court may strike from "any pleading any insufficient defense or any redundant, immaterial, impertinent or scandalous matter." Fed. R. Civ. P. 12(f).  "Motions to strike affirmative defenses are generally disfavored." *New England Health Care Employees Welfare Fund v. iCare Mgmt., LLC.*, 792 F. Supp. 2d 269, 288 (D. Conn. 2011).  In order to prevail on a motion to strike an affirmative defense, Sprague must demonstrate that (1) there is no question of fact that might allow the defense to succeed; (2) there is no substantial question of law that might allow the defense to succeed; and (3) [it] would be prejudiced by the inclusion of the defense." *Id*. (internal quotations omitted).

In Count One of its third-party complaint, Sprague made a claim for contractual indemnification.  In response to many of the allegations in Count One, Kleen admits that Sprague has quoted the contract language, but states that "[i]n further answer it denies that Section [8.1 and 8.3 of the Agreement] appl[y] to the claims asserted against Sprague by Kleen's insurers because Sprague knowingly sold its gas to Kleen for gas blows which was an ultra-hazardous and/or inherently dangerous use of its product and its conduct was reckless, wanton and/or willful as more specifically set forth in its Affirmative Defenses." *See* ¶¶ 6, 7, 9, 10. Other paragraphs in the answer to Count One also state that Kleen's conduct was reckless because gas blows are inherently dangerous. *See* ¶¶ 13, 14.

Sprague argues that these allegations are "improper, untrue, self-serving, presumptuous and possibly prejudicial, [and] not proper for an Answer."  Sprague's Mot. to Strike at 4. Sprague also argues that to the extent these allegations survive, they are redundant and should be stricken.

At the end of its answer to Count One, Kleen states that "WHEREFORE the Third-Party Defendant Kleen Energy Systems, LLC denies that the Third-Party Plaintiff is entitled to the requested relief and it moves for judgment in its favor of no cause for action together with its costs and attorneys' fees so wrongfully sustained."  Sprague argues that it is improper for Kleen to attempt to move for judgment in its answer, and that those portions of the "Wherefore" clause should be stricken.

In Count Two of its third-party complaint, Sprague made a claim for breach of contract. In its answer, Kleen incorporated paragraphs 1-17 of its answer to Count One.  Sprague argues that paragraphs 6, 7, 9, 10, 13, and 14 of Count Two should be stricken for the same reasons they should be stricken from Count One.

In paragraphs 18 and 19 of its answer to Count Two, Kleen again repeats the language about Sprague knowingly selling gas for an ultra-hazardous activity, and thereby acting recklessly.  Sprague argues that that language should be stricken.  The "wherefore" clause to Count Two also moves for judgment, which Sprague again argues is improper.

Finally, Kleen raises as an affirmative defense that Sprague sold gas for what it knew to be an ultra-hazardous purpose, and that its failure to warn was reckless.  Sprague argues that this "defense" is not an real defense, but is instead just repeated allegations from the first-party action.  Therefore, Sprague argues, the defense should be stricken.  Sprague also says that Kleen cannot in good faith allege that Sprague was involved in any way with the gas blow process.

Sprague's motion to strike is denied.  Sprague's third-party complaint argues that Kleen contractually agreed to indemnify Sprague.  Kleen's answer asserts that any indemnification does not apply to conduct that was reckless, and that Kleen intends to argue that Sprague's conduct was reckless.  This is a reasonable response to Sprague's third-party complaint, and

thus, given that motions to strike are disfavored, the motion to strike is denied.

C. Sprague's Motion to File a Third-Party Complaint

Sprague next seeks leave to file a third-party complaint against Andrew Pike as an authorized representative of Kleen, and Andrew Pike in his capacity as Vice-President for Energy Investors Funds Group, LLC and/or EIF Management. Sprague also seeks leave to file the complaint against Energy Investors Funds Group, LLC, and against EIF Management. That third-party complaint is based on the indemnification contract between Sprague and Kleen, which was signed by Pike.

Kleen argues that Sprague's motion should be denied, because the third-party complaint is futile. Kleen argues that, when an agent signs a contract on behalf of his principal, the contract is with the principal alone. Indeed, in Connecticut, a defendant cannot be individually liable for signing a contract as an agent for a principal. *See Maretz v. 595 Corporate Circle*, 258 Conn. 121, 129 (2001).

Nothing in the proposed third-party complaint suggests that Pike was acting in his individual capacity when he signed the Sprague/Kleen Contract. In fact, the complaint alleges that "[t]he Agreement was executed by Andrew N. Pike, who upon information and belief at the time of its execution was an employee and/or agent of Energy Investors Funds and/or EIF Management LLC, and who at the time represented that he was signing as an authorized representative of Kleen." Proposed Third-Party Compl. at ¶ 6.

Sprague does allege that in the Agreement, "Pike promised to Sprague that Pike 'shall have responsibility for and assume any liability with respect to said Gas after its delivery to Buyer at the Delivery Point(s).'" *Id.* at ¶ 8. The terms of the contract, however, do not bind Pike, but instead state that "Buyer shall have responsibility for and any assume any liability with

respect to said Gas after its delivery to Buyer. . . ."  Sprague's Mot. to Serve, Ex. B at ¶ 8.1.

There is thus no indication that the contract was entered into by both Pike and Kleen, or that Pike

was acting as anything other than an agent.  There are no grounds for Pike's liability under the

contract, and the motion for leave to file is therefore denied.

   D.  Algonquin's Motion to Dismiss

  Algonquin, which delivered the natural gas to the Kleen Plant, moves to dismiss all

claims against it.

   1.  *Strict Liability Claim*

  In Connecticut, a defendant who engages in an ultrahazardous activity is strictly liable for

any injuries that result from that activity.  "'[A] plaintiff is not required to show that his loss was

caused by the defendant's negligence.  It is sufficient to show only that the defendant engaged in

an ultrahazardous activity that caused the defendant's loss.'"  *Collins v. Olin Corp.*, 418 F. Supp.

2d 34, 47 (D. Conn. 2006) (quoting *Green v. Ensign-Bickford Co.*, 25 Conn. App. 479, 482

(1991)).  An activity is ultrahazardous if it is "'an instrumentality capable of producing harm;

circumstances and conditions [exist] in its use which, irrespective of a lawful purpose or due

care, involve a risk of probable injury to such a degree that the activity fairly can be said to be

intrinsically dangerous to the person or property of others; and a causal relation [exists] between

the activity and the injury for which damages are claimed.'"  *Id.* (quoting *Caporale v. C.W.*

*Blakeslee & Sons, Inc.*, 149 Conn. 79, 85 (1961).  Traditionally, strict liability has been applied

in cases involving explosions, and Algonquin does not contest that a gas blow is an

ultrahazardous activity.

  Algonquin argues that the strict liability claim should be dismissed because the plaintiffs

have failed to allege that Algonquin engaged in an ultrahazardous activity.  During oral

argument, the plaintiffs conceded that there was no basis to believe that Algonquin did anything other than transport gas through a gas pipeline. Algonquin was not involved in the gas blow itself, and thus did not engage in the ultrahazardous activity. Accordingly, Algonquin's motion to dismiss the strict liability claim is granted.

### 2. *Negligence and Recklessness Claims*

Algonquin next moves to dismiss the negligence and recklessness claims against it. Both claims are based on Algonquin's failure to warn Kleen that it was dangerous to use natural gas in a gas blow. Traditionally, a duty to warn claim is brought against a product seller. Under the Connecticut Product Liability Act, "[a] product seller may be subject to liability for harm caused to a claimant who proves by a fair preponderance of the evidence that the product was defective in that adequate warnings or instructions were not provided." Conn. Gen. Stat. § 52-572q(a). A "product seller" means "any person or entity, including a manufacturer, wholesaler, distributor or retailer who is engaged in the business of selling such products whether the sale is for resale or for use or consumption." Conn. Gen. Stat. § 52-572m(a). "The term 'product seller' also includes lessors or bailors of products who are engaged in the business of leasing or bailment of products." *Id.* A transporter is not a product seller under the Connecticut Product Liability Act.

Product sellers are not the only entities subject to a duty to warn. A common carrier may have a duty to warn. *Green v. H.N.S. Mgmt. Co.*, 91 Conn. App. 751, 759 (2005). A possessor of land may have a duty to warn invitees of danger. *Romenici v. Trumbull Electric Mfg. Co.*, 145 Conn. 691, 694 (1958). But the plaintiffs have cited no case, and I have found none, suggesting that a transporter of a good owes a duty to the buyer of the good to warn that the good may be dangerous when used in the intended manner. This is particularly true when, as here, the plaintiffs do not even allege that the good was <u>transported</u> in a negligent or reckless manner.

Therefore, Algonquin's motion to dismiss the negligence and recklessness claims is granted.

E.  Spectra's Motion to Dismiss

Spectra also moves to dismiss all claims against it.  Spectra, like Algonquin, was a transporter of natural gas.  If the claims against it were limited to transportation, they would be insufficient to constitute a cause of action.  But the plaintiffs allege that Spectra took a more active role in the gas blow than that.  Specifically, the plaintiffs allege that Spectra "participat[ed] in developing a protocol for gas blows at the Kleen Plant which expelled excessive volumes of natural gas into a confined area where it collected with several ignition sources present resulting in an explosion causing death, injuries and property damage."  3d Am. Compl. at ¶ 99(c).[2]  In the complaint, the plaintiffs did not allege the nature of Spectra's involvement in the gas blow protocol, but merely alleged that Spectra was a "participant."[3]  In order to survive a motion to dismiss, the plaintiffs must state with some degree of specificity what conduct of the defendant's raises the claims to the level of plausibility.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).  Because the plaintiffs have failed to do so here, Spectra's motion to dismiss is granted without prejudice to repleading a claim based on involvement in the gas blow within thirty days of this ruling.

F.  Subcontractors' Motions to Dismiss

The subcontractors, Bluewater, Keystone, Siemens, and WorleyParsons, bring motions to dismiss alleging that all counts against them should be dismissed.  Several of the subcontractors argue that certain of the claims against them are insufficiently pled.  All of the subcontractors

---

[2] Although the plaintiffs made similar allegations with regard to Algonquin, at the motion hearing the plaintiffs admitted that they had no reason to believe Algonquin was involved in developing gas blow protocols.

[3] In response to the motion to dismiss, the plaintiffs provided the court with an affidavit describing Spectra's involvement in the gas blows.  I am unable to consider that additional

seek dismissal because (1) they are insured under plaintiffs' policies, and insurers cannot seek subrogation against their own insureds; and (2) because Kleen waived its right to subrogation.

### 1. *Bluewater's Motion to Dismiss the Claim for Recklessness (Count Three)*

Bluewater argues that the recklessness claim against it should be dismissed, because the plaintiffs' factual allegations are insufficient to state a cause of action. Plaintiffs allege that Bluewater: (1) designed and implemented a gas blow process in which natural gas was released at high pressure into a small area with numerous sources of ignition; (2) selected and/or recommended gas blows to clean fuel gas piping despite knowing it was inherently dangerous; (3) failed to follow its own gas blow commissioning procedures; (4) designed and implemented a gas blow process when it knew it didn't have the necessary expertise; (5) permitted a Keystone employee with no experience to design and implement the temporary piping for the gas blow; (6) refused to modify the temporary gas piping configuration after it was warned that that configuration would result in a dangerous amount of natural gas being blown into a small space with numerous ignition sources; and (7) discharged an employee because he attempted to develop safer procedures. These allegations are sufficient to satisfy a claim for recklessness. Thus, Bluewater's motion to dismiss the recklessness claim on this ground is denied.

### 2. *Keystone's Motion to Dismiss the Recklessness Claim (Count One)*

Keystone also argues that the plaintiffs have failed to state a claim for recklessness against it. The plaintiffs allege that Keystone: (1) assumed responsibility for designing and implementing the gas blow, when it knew it did not have the necessary expertise; (2) implemented a gas blow that expelled gas into a confined area with numerous sources of ignition; (3) falsely represented that it possessed the experience necessary to design and

---

material at the motion to dismiss stage.

implement the gas blow process; (4) ordered an employee with no experience to design the temporary gas piping; (5) failed to follow its gas blow commissioning procedures; (6) failed to conduct a safety meeting; (7) failed to de-energize sources of ignition, and ordered workers to continue welding where flammable natural gas was to accumulate; (8) recommended natural gas to clean gas piping because it was faster; and (9) proceeded with the February 7 gas blow without obtaining permission from Bluewater.

Keystone's motion to dismiss the recklessness claim relies principally on its assertion that plaintiffs fail to allege knowledge on Keystone's part sufficient to sustain a recklessness claim. Although fewer than all of the allegations against Keystone may constitute recklessness as opposed to negligence or gross negligence, the claim nonetheless survives. Plaintiffs allege, for example, that Keystone permitted the gas blow to proceed "when it was obvious" that the design "would permit excessive amounts of natural gas to collect in a confined area where there were numerous sources of ignition." 3d Am. Compl. at ¶ 35(g). Drawing all reasonable inferences in favor of plaintiffs, these allegations sufficiently allege recklessness. Accordingly, Keystone's motion to dismiss the recklessness claim on this ground is denied.

### 3. Siemens' Motion to Dismiss the Recklessness Claim (Count Twelve)

Siemens also moves to dismiss the recklessness claim against it. The plaintiffs have alleged that Siemens acted recklessly by: (1) permitting the gas pipes at the Kleen Plant to be cleaned with natural gas, despite knowing that such a process was inherently dangerous; (2) using language in the "system requirements" that "suggested" natural gas was acceptable and safe to clean pipes, even though it knew it was not; (3) failing to ensure the cleaning contractors prepared a detailed procedure addressing system preparation, cleaning, and restoration for the gas blow process; (4) mandating that Kleen clean its gas piping, but failing to take any steps to

ensure the gas blow process was performed by parties with appropriate experience and expertise; (5) failing to specify upper limits on gas pressure of gas blows in the "system requirements;" and (6) failing to take a lead role in pre-gas blow meetings.

Siemens' alleged conduct does not rise to the level of recklessness. For the most part, the plaintiffs only allege passive conduct: for example, failure to take a lead role and failure to ensure cleaning contractors establish a procedure. The only affirmative conduct the plaintiffs allege is that Siemens told Kleen the gas pipes had to be cleaned, and that Siemens "suggested" natural gas was a safe way to do so, even though it knew it was not. Examination of the "system requirements" referred to in the complaint shows that the document contains a "safety" section that directs cessation of welding, grinding and operation of electrical equipment if a gas blow is to be performed. The Siemens document also directs selection of "location and orientation of the outlet to best allow dissipation of gas." At most, Siemens' conduct may have been negligent, it does not rise to the level of recklessness. Accordingly, Siemens' motion to dismiss the recklessness claim is granted.

### 4. *Siemens' Motion to Dismiss the Strict Liability Claim (Count Thirteen)*

Siemens has also filed a motion to dismiss the strict liability claim. Siemens did not partake in the ultrahazardous activity. All Siemens did was require Kleen to clean the gas pipes. Siemens did not require they be cleaned through gas blows, or involve itself in the Kleen Plant gas blows. Therefore, I grant Siemens' motion to dismiss the strict liability claim against it.

### 5. *WorleyParsons' Motion to Dismiss the Recklessness Claim (Count Five)*

Next, WorleyParsons moves to dismiss the recklessness claim against it. The plaintiffs have alleged that WorleyParsons acted recklessly by: (1) reviewing and accepting Siemens' "system requirements" that suggested natural gas was safe to clean pipes, even though it knew it

would influence other parties to use that process; (2) accepting the gas blow process when it knew the process had been outlawed in other parts of the world where it conducts business; (3) reviewing and accepting Siemens' suggestion that gas blows were safe when it knew that a large turbine manufacturer in the United States recommended other methods for cleaning gas piping; (4) reviewing and accepting Siemens' "system requirements" regarding system cleaning when it knew that the gas blow process was flawed; (5) allowing or failing to object to flawed designs and implementation at pre-gas blow meetings; (6) failing to include in its design an accommodation for temporary gas piping; and (7) failing to identify the gas blow procedure as a "Key Issue" in its proposal summary.

WorleyParsons' conduct does not rise to the level of recklessness. For the most part, the plaintiffs only allege passive conduct: for example, acceptance of Siemens' "system requirements" and attendance at pre-gas blow meetings. Although that conduct may have been negligent, it was not reckless. Accordingly, WorleyParsons' motion to dismiss the recklessness claim is granted.

6. *WorleyParsons' Motion to Dismiss the Strict Liability Claim (Count Six)*

WorleyParsons has also filed a motion to dismiss the strict liability claim and adopts the arguments set forth by other defendants to the extent that they apply. WorleyParsons merely provided engineering services for the construction of the Kleen Plant and accepted Siemens' "system requirements" for gas blows. WorleyParsons did not require the pipes be cleaned through gas blows, or involve itself in the Kleen Plant gas blows. Thus, I grant WorleyParsons' motion to dismiss the strict liability claim.

7. *Whether the Subcontractors are Insured by the Plaintiffs*

a. *Whether the Subcontractors are Additional Insureds*

Under the "antisubrogation rule," "an insurer has no right of subrogation against its own insured for a claim arising from the very risk for which the insured was covered." *Standard Fire Ins. Co. v. Drummey*, No. CV065002071, 2007 WL 361826, at *6 (Conn. Super. Jan. 25, 2007). The question, then, is whether the subcontractors were covered by the plaintiffs' insurance policies.

Kleen's insurance policy with the plaintiffs provided that:

> To the extent required by any contract or subcontract for the Insured Project, and then only as their respective interests may appear, all owners, all contractors and subcontractors of every tier, tenants of the INSURED PROJECT, and any other individual or entity specified in such contract or subcontract, are recognized as Additional Insureds hereunder.

Bluewater's Mot. to Dismiss, Ex. B at 21.[4]  The subcontractors are covered by the plaintiffs' insurance policy, then, to the extent required by the Kleen/O&G Contract.  The Kleen/O&G Contract provides that:

> Owner shall purchase and maintain . . . property insurance written on a builder's risk "all risk" or equivalent form on a completed value basis. . . .  This insurance shall name the Owner as the First Named Insured, and <u>also insure the interests of the Contractor, and Contractor's subcontractor and subcontractors</u> in the facility.

Bluewater's Mot. to Dismiss, Ex. A at 12.3.  The subcontractors argue that this provision shows that Kleen was required to maintain insurance for the subcontractors, and thus that the subcontractors were covered under the plaintiffs' policy.

The plaintiffs argue that "insuring the interests" of the subcontractors is not the same as the subcontractor being an "additional insured."  Elsewhere in the Kleen/O&G Contract, the parties provide that "Additional insured coverage shall be provided to Owner and the Financing

---

[4] Plaintiffs' various builder's risk insurance policies follow the form of a single lead policy issued by Ace American Insurance Company.  Unless otherwise noted, the term "insurance policy" refers to Kleen's insurance agreements with the plaintiffs.

Parties, and their officers and employees." Bluewater's Mot. to Dismiss, Ex. A at 12.1.3. Thus, the plaintiffs argue, if Kleen had wanted the subcontractors to be "additional insureds," it would have specified as much. The plaintiffs conclude that "insure the interests" must have some meaning distinct from being an "additional insured."

Elsewhere, the Kleen/O&G Contract provides that

A loss insured under the Builder's Risk Property insurance described herein shall be adjusted by Owner as fiduciary and made payable to Contractor as fiduciary for the insureds, as their interests may appear, or as required by the Financing Parties. Contractor shall pay each sub-contractor its just shares of insurance proceeds received by Contractor, and by appropriate agreements, written where legally required for validity, shall require its subcontractors to make payments to their sub-subcontractors in similar manner.

Bluewater's Mot. to Dismiss, Ex. A at 12.3. The plaintiffs take from this statement that subcontractors are not additional insureds under the insurance agreement. The plaintiffs conclude that the subcontractors are not entitled to make a direct claim, but may still receive monies paid by the plaintiffs if the claim includes damages to their interests.[5]

The plaintiffs are mistaken. Although it is true that different sections of the construction contract and the insurance policy use the phrase "additional insureds" and others do not, the meaning of the two agreements is clear. The construction contract, at section 12, defines the scope of coverage required. For example, section 12.1 and its subparts describe insurance that

---

[5] In support of their argument, the plaintiffs cite *Stop & Shop Supermarket Co. v. Abco Refrigeration Supply Corp.*, 48 Conn. Supp. 301 (2003). *Stop & Shop* was also a subrogation action, in which the defendant claimed to be an additional insured. The contract in that case stated that "Unless otherwise provided, the Owner shall purchase and maintain . . . property insurance upon the entire Work at the site to the full insurable value thereof. This insurance shall be on an all-risk policy form and shall include interests of the Owner, the Contractor, Subcontractors, and Sub-subcontractors in the Work and shall insure against the perils of fire." *Id*. at 305. The Court concluded that the defendant was not an "additional insured" under that agreement because "[w]hen Stop & Shop wanted to designate others as additional insureds, it did so." *Id*. at 311. I believe there is more evidence in this case that the subcontractors were actual insureds under the contract, including the fact that the Contractor was considered a fiduciary for

the subcontractors must purchase. The following section, 12.2, describes insurance that the contractor and subcontractors must purchase. The section of the construction contract dealing with All Risk Insurance, section 12.3, provides for insurance purchased by the owner for the benefit of the contractor and subcontractors. Although the language is different in that section, the substance is not. The substance of that section provides that the owner must buy insurance protecting contractors' and subcontractors' interests. The insurance policy, however, determines whether parties are "additional insureds." The section of the insurance policy providing that subcontractors are additional insureds, Part C, Section One, says "[t]o the extent required by any contract or subcontract for the Insured Project . . . subcontractors . . . are recognized as Additional Insureds." Bluewater's Mot. to Dismiss, Ex. B, at 21.

The construction contract compels the purchase of an insurance policy. The insurance policy actually purchased provides that subcontractors of policyholders are additional insureds. When a policy says that, to the extent required by the contract, a party is an additional insured, and the contract insures that party's interest, the combination of these terms seems to me to suggest, if not to compel, the conclusion that the party is an additional insured. I see no more reasonable construction.

Bluewater finds other language in the Kleen/O&G Contract to support its argument that subcontractors are additional insureds. It notes that the first sentence of the section on "Builder's All Risk Insurance" provides that the Owner shall purchase and maintain insurance "for the benefit of Owner and the Financing Parties, as well as the benefit of the Contractor and other project participants." Bluewater's Mot. to Dismiss, Ex. A at 12.3. Thus, Bluewater argues, the All Risk Insurance is for the benefit of project participants such as the subcontractors. Bluewater

the "insureds," including the subcontractors.

also argues that to "insure the interests of" the subcontractors clearly means to include the subcontractors as additional insureds under the insurance policy. Bluewater notes that the language of the Kleen Contract is very broad – it insures the "value for the entire Facility at the site on a replacement costs basis." Bluewater also points to the language of the insurance agreement, which states that "To the extent required by any contract or subcontract for the Insured Project . . . all owners, all contractors and subcontractors of every tier . . . are recognized as Additional Insureds hereunder." Bluewater argues that this provision anticipates that when Bluewater is insured, it will be as an "additional insured."[6]

In sum, I believe the Kleen/O&G contract provides that subcontractors are covered by the insurance agreement. The clearest reading of the contract provides that, if subcontractors are to be insured, it is as "additional insureds."

### b. *Whether the Doctrine of Waste Precludes Subrogation*

Subrogation is an equitable doctrine, and "'[t]he determination of what equity requires in a particular case, the balancing of equities, is a matter for the discretion of the trial court.'" *Wasko v. Manella*, 269 Conn. 527, 542 (2004) (quoting *Kakalik v. Bernardo*, 184 Conn. 386, 395 (1981)). Because subrogation is an equitable doctrine, a court can decide that subrogation is inappropriate in certain circumstances. In doing so, however, a court must bear in mind that "'[s]ubrogation is a highly favored doctrine . . . which courts should be inclined to extend rather

---

[6] Perhaps the least convincing of Bluewater's arguments is that the contract should be read in the subcontractors' favor because the contract is ambiguous. "'As with contracts generally, a provision in an insurance policy is ambiguous when it is reasonably susceptible to more than one reading. . . . Under those circumstances, any ambiguity in the terms of an insurance policy must be construed in favor of the insured because the insurance company drafted the policy.'" *Johnson v. Conn. Ins. Guar. Ass'n*, 302 Conn. 639, 640 (2011) (quoting *Conn. Med. Ins. Co. v. Kulikowski*, 286 Conn. 1, 5-6 (2008)). The ambiguity here stems not from the insurance agreement, however, but the contract between Kleen and O&G. There is no indication that Kleen alone drafted the contract, and thus the usual rule regarding ambiguity in

than restrict.'" *Wasko*, 527 Conn. at 543 (quoting *Westchester Fire Ins. Co. v. Allstate Ins. Co.*, 236 Conn. 362, 372 (1996)).

The Connecticut Supreme Court has held that, as a policy matter, a landlord's insurer has no right of subrogation against a tenant. *DiLullo v. Joseph*, 259 Conn. 847, 851 (2002). The Court in *DiLullo* was motivated by the fact that the tenant's rent presumably included some calculation of the landlord's insurance premium, and to hold otherwise would create a strong incentive "for every tenant to carry liability insurance in an amount necessary to compensate for the value, or perhaps even the replacement cost, of the entire building, irrespective of the portion of the building occupied by the tenant." *Id*. at 854. This would lead to two different individuals carrying insurance policies on the entire building, which the Court held would be a form of economic waste.

Two years after *DiLullo*, the Connecticut Supreme Court held a homeowner's insurer did have a right of subrogation against a houseguest. *Wasko*, 527 Conn. at 545. The Court in *Wasko* noted that there would be no economic waste in that situation, because a houseguest would already be covered by his third-party liability coverage; the parties would not be buying insurance to cover the same property in the way that they were in *DiLullo*. *Id*. at 546. The Court also held that a tenant would not expect to be sued in a subrogation action, but that social houseguests would expect to be sued for negligent conduct in another's home. *Id*. at 547.

Bluewater argues that this situation is more like *DiLullo*: In large construction projects, it would be wasteful to require the owner, the contractor, and every subcontractor to carry insurance equal to the value of the entire property. The plaintiffs argue that this situation is more

---

insurance agreements does not apply here.

like *Wasko*: Contractors and subcontractors likely already carry liability insurance, just as a houseguest carries third-party liability coverage.

I believe this situation is much more analogous to *DiLullo* and the landlord/tenant relationship. A right to subrogation would encourage each party to carry insurance for the same risk on the same property. Nevertheless, I decline to hold that the doctrine of equitable waste precludes this subrogation action. Subrogation actions are to be encouraged, and the Connecticut appellate courts have not yet extended the doctrine of equitable waste this far.

c. *Whether the Terms of the Insurance Coverage Apply to this Situation*

The plaintiffs argue that, even if their insurance policy does cover the subcontractors, they should still be allowed to bring suit. This is because the insurance agreement provides coverage to subcontractors to the extent required by contract, "and then only as their respective interests may appear." Bluewater's Mot. to Dismiss, Ex. B at 21. The plaintiffs argue that the phrase "as their interests may appear" allows Bluewater to recover with respect to its own tools and equipment, and for the work it performed on the Kleen Plant, but does not extend coverage to the subcontractor for any other claims relating to the Kleen Plant.

The plaintiffs acknowledge that courts outside of Connecticut are split on this issue. Courts holding in favor of limiting coverage note that subcontractors often carry their own liability insurance. *See, e.g.*, *Turner Const. Co. v. John B. Kelly, Co.*, 442 F. Supp. 551 (E.D. Pa. 1976). In fact, in this case, the Kleen/O&G Contract required the subcontractors to carry liability insurance with at least a $1,000,000 limit per occurrence. Bluewater's Mot. to Dismiss, Ex. A at 12.2.

Courts that hold to the contrary have expressed concern that this would limit a subcontractor's willingness to cooperate with an insurance investigation, because that

investigation could later be used against it. *See, e.g.*, *Baugh-Belarde Const. Co. v. College Utils. Corp.*, 561 P.2d 1211 (Alaska 1977). Some courts have also noted that disallowing subrogation reduces litigation and that disallowing subrogation will require subcontractors to obtain liability insurance. *See id.* at 1214-15.

In any event, I do not need to reach the question whether subrogation is permitted against a subcontractor who is designated as an insured "as its interests may appear." The "as their interests may appear" language is ambiguous in the present contract. Ambiguous language in an insurance agreement is construed in favor of the insured. *Johnson*, 302 Conn. at 640. Thus, I find that the subcontractors are fully covered by the insurance provisions.

8. *Whether Kleen Waived Its Right to Subrogation*

The subcontractors also argue that all claims against them should be dismissed because Kleen expressly waived its right to subrogation against them. The Kleen/O&G Contract provides:

> Owner, and Contractor waive all rights against each other and any of their subcontractors, sub-subcontractors, agents and employees, each of the other, for damages caused by fire or other causes of loss to the extent covered by Builder's Risk Property insurance obtained pursuant to Section 12.3 or other property insurance applicable to the Work, except such rights as they have to proceeds of such insurance held by Owner as fiduciary. . . . A waiver of such rights shall be effective as to a person or entity even though that person or entity would otherwise have a duty of indemnification, contractual or otherwise, did not pay the insurance premium directly or indirectly, and whether or not the person or entity had an insurable interest in the property damaged.

Bluewater's Mot. to Dismiss, Ex. A at 12.5 (emphasis added). The insurance agreement also provides:

> If the Company pays a claim under this Policy, it will be subrogated, to the extent of such payment, to all the Insured's rights of recovery from other persons, organizations and entities. The Insured will execute and deliver instruments and papers and do whatever else is necessary to secure such rights.

The Company will have no rights of subrogation against:

a. any person or entity, which is an Additional Insured;

b. any other person or entity, against which the Insured has waived its rights of subrogation in writing before the time of loss.

Notwithstanding the foregoing, it is a condition of this policy that the Company shall be subrogated to all the Insured's rights of recovery against:

A. Any Architect or Engineer, whether named as an Insured or not, for any loss or damage arising out of the performance of professional services in their capacity as such and caused by any error, omission, deficiency or act of the Architect or Engineer, by any person employed by them or by any others for whose acts they are legally liable, and;

B. Any manufacturer or supplier of machinery, equipment or other property, whether named as an Insured or not, for the cost of making good any loss or damage which said party has agreed to make good under a guarantee or warranty, whether express or implied.

Bluewater's Mot. to Dismiss, Ex. B at Part F.

The plaintiffs do not deny that the waiver is valid generally, but instead argue that the waiver is against public policy with respect to claims of recklessness and strict liability. Indeed, many courts, including courts in this district, have held that waivers of liability for claims of recklessness are against public policy. *See Western Alliances Ins. Co. v. Wells Fargo Alarm Servs., Inc.*, 965 F. Supp. 271 (D. Conn. 1997); *Dominici v. Between the Bridges Marina*, 375 F. Supp. 2d 62 (D. Conn. 2005). Both *Western Alliances* and *Dominici* are distinguishable. In *Western Alliances*, the court held that there was no waiver because the contract did not "clearly and unequivocally isolate the landlord from liability for such conduct, and because it does not appear that the Connecticut Supreme Court would uphold such a broad exculpatory provision under the circumstances presented here." 965 F. Supp. at 279. In *Dominici*, the court held that a waiver of liability for recklessness was unenforceable under admiralty law. Nevertheless, the reasoning in those cases is applicable here. Striking waivers of liability for recklessness claims

"is well-established at common law. . . , and appears based on a recognition that sound public policy requires greater deterrents to gross negligence or intentional misconduct than to ordinary negligence. Moreover, enforcing an exculpatory clause as applied to a party's gross misconduct does little to aid the freedom of contract, because while businesspersons may reasonably anticipate accidents or ordinary negligence and account for who bears the risk of damage in setting the price of a contract, contracting parties rely on the other's good faith and fair dealing." *Dominci*, 375 F. Supp. 2d at 68.

Neither *Western Alliances* nor *Dominici* applied to a waiver of subrogation, however. The subcontractors seize on that important distinction, noting that there is no Connecticut case equating liability waivers with waivers of subrogation, or finding waivers of subrogation void as a matter of public policy. Prohibitions against waivers of liability for recklessness and strict liability exist to ensure the compensation of tort victims. In this case, Kleen was paid for its loss. Moreover, the plaintiffs knowingly agreed to insure the construction of the Kleen Plant and neither the construction contract nor the insurance policy provided an exception or exclusion for reckless or ultrahazardous conduct. For these reasons, I will not strike the waiver between Kleen and the subcontractors to the extent it prohibits subrogation actions for recklessness or strict liability. Accordingly, the recklessness and strict liability claims against all subcontractors are dismissed.

### 9.   *Whether the Subcontractors are Immune from Apportionment of Liability*

Although the subcontractors are additional insureds under the insurance contract and, thus, the insurers may not seek subrogation against them on the negligence claims, the subcontractors are not immune from liability from consideration for apportionment of damages

in a negligence action. The Connecticut statute providing for the apportionment of liability

against non-parties in negligence actions provides,

> No person who is immune from liability shall be made an apportionment
> defendant nor shall such person's liability be considered for apportionment
> pursuant to Section 52-572h . . . .

Conn. Gen. Stat. § 52-102b(c). A contractual release of liability under the terms of an insurance

agreement, however, does not grant "immunity" from liability that acts to remove a party from

consideration for apportionment damages in a negligence action.

In *Rocky Mountain Helicopter, Inc. v. Connecticut Light & Power*, No. CV 93-0526648S,

1995 WL 574516 (Conn. Super. Sept. 18, 1995), a Connecticut trial court faced similar facts.

Rocky Mountain, a helicopter company, sued several defendants, including the Westfield Fire

Department. Westfield sought to bring in Hartford Hospital for apportionment purposes. Rocky

Mountain's insurance policy precluded it from seeking recovery against the apportionment

defendant, Hartford Hospital. Rocky Mountain argued that, because Hartford Hospital was

immune from liability to Rocky Mountain, Westfield should not be allowed to bring the

apportionment claim against the Hospital. The trial court allowed Westfield to bring the

apportionment claim, refusing to "extend the concept of immunity for [section] 52-102 purposes

to situations where immunity is not created by statute or courts but by contractual arrangements

between the parties." *Id.*, at *3.

There are only three contexts in which a person has been held to be "immune from

liability" for purposes of section 52-102b: (1) sovereign immunity, (2) parental immunity; and

(3) immunity of an employer pursuant to the workers' compensation statutory scheme. *See*

*Bloom v. Gershon*, 271 Conn. 96 (2004) (sovereign immunity); *Crotta v. Home Depot, Inc.*, 249

Conn. 634 (1999) (parental immunity); *see, e.g.*, *Balogh v. Boehringer Ingelheim*, No.

CV010276094S, 2002 WL 521320 (Conn. Super. Mar. 19, 2002) (employer who is immune from direct action under exclusivity provisions of Workers' Compensation Act may not be named as an apportionment defendant); *Allen v. Hutchinson*, No. 404673, 2001 WL 419216 (Conn. Super. Apr. 10, 2001) (same). None of those bases of immunity from liability for purposes of section 52-102b are present here. Accordingly, the subcontractors are not "immune" from consideration for apportionment damages.

**IV.     Conclusion**

For the reasons stated above, I grant the following motions: doc. 63 (Bluewater's motion to dismiss), doc. 65 (Keystone's motion to dismiss), doc. 156 (Sprague's motion to dismiss), doc. 159 (WorleyParsons' motion to dismiss), doc. 162 (Siemens' motion to dismiss), and doc. 173 (Algonquin and Spectra's motion to dismiss). I deny doc. 137 (Sprague's motion to strike) and doc. 188 (Sprague's motion to file a third-party complaint).

It is so ordered.

Dated at Bridgeport, Connecticut, this 27th day of September 2012.

/s/ Stefan R. Underhill
Stefan R. Underhill
United States District Judge